UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/08/2024
```

------------------------------------------------------------------X
                                                   :

GILDA VINCENT, *individually and on behalf of all*   :
*others similarly situated*,                                 :
                                             :

                        Plaintiff,         :            24-cv-440 (LJL)
                                            :

               -v-                     :       MEMORANDUM AND
                                            :           ORDER

NATIONAL DEBT RELIEF LLC,             :
                                             :
                      Defendant.       :
                                             :
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant National Debt Relief LLC ("Defendant" or "NDR") moves, pursuant to

Section 1 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, for an order compelling

arbitration and staying this action. Dkt. No. 16. For the reasons that follow, the motion is

denied.

## BACKGROUND

### I.    Allegations of the Complaint

      Defendant is a New York limited liability company that owns and operates a website,

nationaldebtrelief.com (the "Website"), on which Defendant advertises that it can help customers

settle debt for less than the customers owe. Dkt. No. 1 ¶¶ 1, 7, 37. The Website presents

customers with information about its debt relief services, client success stories, and the ability to

apply for the Website's services. *Id.* ¶ 37.

      Plaintiff Gilda Vincent ("Plaintiff") is an individual who resides in San Jose, California.

*Id.* ¶ 6. She has visited the Website multiple times on her desktop browser, including as long ago

as November 2022 and as recently as January 2024. *Id.* ¶ 55.

Plaintiff alleges that, when she accessed the Website, Defendant caused a tracking device, the Claritas TRKN Tracker (the "TRKN Tracker" or "Tracker"), to be installed on her internet browser. *Id.* ¶¶ 2, 56.  The Tracker was then used to capture her IP address,[1] in violation of Section 638.51(a) of the California Invasion of Privacy Act ("CIPA").  *Id.* ¶¶ 2–4, 56.  In particular, when a user visits the Website, the user's browser sends an HTTP request to Defendant's server, and Defendant's server sends an HTTP response with directions to install the TRKN Tracker on the user's browser.  *Id.* ¶ 30.  The TRKN Tracker was developed and is operated by a software-as-a-service company named Claritas, which for a fee, provides website owners services that enable them to collect the IP addresses of website users, in order to assist website owners in data and marketing campaigns.  *Id.* ¶¶ 27, 29, 47.  After it is installed, the TRKN Tracker instructs the user's browser to send Claritas the user's IP address.  *Id.* ¶ 30.  In turn, Claritas uses the Website data it collects to analyze marketing campaigns, conduct targeted advertising, and boost Defendant's revenue.  *Id.* ¶ 47. Plaintiff did not provide her prior consent to Defendant to install or use the TRKN Tracker on Plaintiff's browser, and Defendant did not obtain a court order before installing or using the TRKN Tracker.  *Id.* ¶¶ 58–59.

Plaintiff alleges that the Tracker qualifies as an illegal pen register under California law. *Id.* ¶¶ 26, 36.  She brings this case as a class action on behalf of all California residents who accessed the Website in California and had their IP address collected by the Tracker.  *Id.* ¶ 61.

---

[1] An IP address is a unique identifier for a device from which the device's state, city and zip code can be determined.  *Id.* ¶¶ 23, 25.

## II.    The Arbitration Agreement

When an internet user enters www.nationaldebtrelief.com (the "Website"), into her

browser and presses Enter, she is greeted by the following screen:



Dkt. No. 18-1 ¶ 3.  As a visitor to the Website scrolls down the page, she is shown several

sections of content.[2]  Dkt. No. 18-1 ¶ 3.  After the initial section, which contains a series of

---

[2] In the declaration of Emily A. Horne, submitted by Plaintiff in opposition to the motion to compel, the declarant describes the Website as consisting of "nine pages," Dkt. No. 18-1 ¶ 3, when the declarant's "internet browser was set to the default 100% zoom," *id.* ¶ 4.  Defendant contests the characterization of the Website as containing several "screens," and instead offers that, "in the ordinary use that you use a website, it's not page one and then you go to the next page and then to the next page.  You have a scroll on your mouse and you scroll."  Dkt. No. 25 at 5:11–13.  The precise vocabulary most apt to describe the geography of the Website is immaterial to the instant motion.  What is material to the motion is Plaintiff's undisputed assertion that the hyperlink to the Terms of Service are not immediately visible when a visitor arrives at the Website, and that a visitor must scroll past several sections of information to see the Terms of Service.  *See id.* at 5:21–6:1 (Defendant responding "[y]es" to the Court's inquiry of whether, if the Court "took what was in the Horne declaration, struck the words 'screen one' and considered it to be a scroll," that would "be an accurate way to view what shows up for the user of the Website"); *see also id.* at 5:9 (Defendant explaining that it did not "dispute" the "veracity" of the Horne declaration, merely that the screenshots depicted scrolls, rather than different screens).  Thus, even though the number of "scrolls" or "screens" that a user is required to navigate to reach the hyperlink to the Terms of Service may be a function of the computer on which the site is viewed, the facts regarding the location of the hyperlink that are material to the instant motion are not in dispute.

hyperlinks across the top of the page against a white background as well as a customer

testimonial and invitation to apply for Defendant's services set against a blue background, the

visitor next sees an interactive box in which she can enter the estimated amount of debt owed in

order to receive a free consultation:



*Id.* Next, as the visitor continues to scroll down, the Website contains a section, set against a

light gray background, summarizing reviews of the Defendant's services across various

platforms, including Google.



*Id.* Then, against a white background, comes a section explaining at a high-level how

Defendant's debt-relief services work—starting with a free consultation, followed by the creation

of a debt repayment plan, and ending with the customer satisfying their debt obligation over

time.



*Id.* Continuing to scroll, the visitor next sees a section with a grey background, which features three prominent customer testimonials, each containing a picture of the customer as well as a description of how much the customer was able to save on their debt repayment in nominal dollar and percentage terms.



*Id.* The section that follows below is set against a white background, and includes a button directing the visitor to further information about Defendant.



*Id.* Below that is a section against a gray background which contains "Essential Reading"—links to articles titled, for example, "Financial Independence Comes in Many Shades," "How to Create Financial Habits That Last: 6 Tips to Kickstart Your Journey," and "The tax implications of the 4 most common types of debt relief."



*Id.* Penultimately, the visitor is shown a section against a white background featuring frequently asked questions that the visitor can click on to see the answers.





*Id.*

Finally, the Website concludes with three separate columns of white text set against a blue backdrop.  Dkt. No. 17-1 at ECF P. 6.  The first column is labeled "Main" and has links for pages titled: "Apply," "How It Works," "About Us," "Client Stories," "Resources," "Blog," and "Account."  *Id.*  The third column is labeled "Support" and has links for pages titled: "Calculators," "Sitemap," and "FAQs."  *Id.*  The second column, the one that is relevant here, is headed "Useful Links" and has links (in order from top to bottom) for pages titled: "Contact Us," "Careers," "Corporate," "Privacy Policies," "Terms of Site," Visitor Information," "News & Media," and "Editorial Team."  *Id.*  The following language appears in small type at the very bottom of the last screen of the homepage, after language indicating Defendant's copyright registration: "This website uses 'cookies' to enhance your browsing experience and for marketing and tracking purposes.  By continuing to browse our site you are consenting to their use.  For more information see our Terms and Privacy Policy."  *Id.*  The first and only reference to the Terms of Site and the Terms and Privacy Policy on the homepage are in this last section.



*Id.*

   A user who clicks on the "Terms of Site" hyperlink on the Website homepage is brought immediately to Defendant's "Online Terms of Service" (the "Terms of Service"), which contain the arbitration provision at issue.  The Terms of Service begin with the following language in capital letters:

> AGREEMENT BETWEEN USER AND National Debt Relief LLC—PLEASE READ THE TERMS OF SERVICE SET FORTH BELOW (THE "TERMS") GOVERN YOUR USE OF THIS WEBSITE ON THE WORLD WIDE WEB (THE "SITE") AND ARE LEGALLY BINDING ON YOU.  IF YOU DO NOT AGREE WITH ANY OF THESE TERMS, DO NOT ACCESS OR OTHERWISE USE THIS SITE OR ANY INFORMAITON CONTAINED ON THE SITE.  YOUR USE OF THE SITE SHALL BE DEEMED TO BE YOUR AGREEMENT TO ABIDE BY EACH OF THE TERMS SET FORTH BELOW.

Dkt. No. 17-1 at ECF P. 8.  Immediately below that language, the Terms of Service contain the following text in bold type:

> **This Agreement contains a binding arbitration agreement.  These Terms affect your legal rights, including an agreement to resolve disputes that may arise between us by arbitration on an individual basis instead of by class actions or jury trials.  As a condition of using this Site, you agree that any disputes pertaining to information presented herein and use of the Site shall be resolved through binding arbitration and not in a court.  You have the right to opt-out of our agreement to arbitrate.**

*Id.*  The bottom of the Terms of Service has a section headed with bold and all capital letters

titled, "**DISPUTES AND ARBITRATION/CLASS ACTION WAIVER**".  It states as follows:

> Any dispute relating in any way to your visiting this website or your use of any of the Services shall be submitted to confidential, binding arbitration in New York, NY, except that, to the extent you have in any manner violated or threatened to violate National Debt Relief, LLC's intellectual property rights, National Debt Relief, LLC may seek injunctive or other appropriate relief in any state or federal court in New York, and you consent to exclusive jurisdiction and venue in such courts. Arbitration hereunder shall be conducted under the rules then prevailing of the American Arbitration Association.  The arbitrator's award shall be binding, but subject to review in accordance with applicable statutes, rules and regulations governing arbitration awards and may be entered as a judgment in any court of competent jurisdiction.  To the fullest extent permitted by applicable law, no arbitration hereunder shall be joined to an arbitration involving any other party subject to these terms and conditions, whether through class arbitration proceedings or otherwise.

> You may opt out of this Agreement to Arbitrate.  If you do so, neither you nor we can require the other to participate in an arbitration proceeding.  To opt out, you must notify us in writing, within 30 days of the date that you first began using this Site subject to these arbitration terms or changes to them, either by U.S. mail delivered to: Attn: Legal Department, National Debt Relief, LLC, P.O. Box 2011, New York, NY 10272 or by email delivered to success@nationaldebtrelief.com. You must include: (1) your name and residence address; (2) the email address and/or mobile telephone number associated with your account; and (3) a clear statement that you want to opt out of this agreement to arbitrate.

*Id.*

## PROCEDURAL HISTORY

Plaintiff filed the complaint on January 19, 2024.  Dkt. No. 1.  She brings claims under

the California Invasion of Privacy Act, Cal. Penal Code § 638.51(a), on behalf of a putative class

defined as all California residents who accessed the Website in California and had their IP

address collected by the Tracker.  *Id.*  ¶¶ 61, 68–77.

On April 25, 2024, Defendant filed this motion to compel arbitration and a supporting

memorandum of law.  Dkt. Nos. 16–17.  Plaintiff filed a memorandum of law in opposition to

the motion on May 9, 2024.  Dkt. No. 18.  Defendant filed a reply memorandum of law on May

16, 2024.  Dkt. No. 19.  The Court held oral argument on the motion to compel arbitration on

May 30, 2024, at which the Court requested additional briefing on the motion.  *See* Minute Entry

of May 30, 2024.  Each party submitted further briefing on June 10, 2024.  *See* Dkt. Nos. 23, 24.

## DISCUSSION

I.      **The Federal Arbitration Act**

Section 4 of the FAA provides that "[a] party aggrieved by the alleged failure, neglect, or

refusal of another to arbitrate under a written agreement for arbitration may petition any United

States district court . . . for an order directing that such arbitration proceed in the manner

provided for in such agreement."  9 U.S.C. § 4.  Section 3 requires courts to stay litigation of

proceedings that are referable to arbitration.  9 U.S.C. § 3.  "[T]hese statutory provisions reflect

both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is

a matter of contract.'"  *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023) (quoting

*AT&T Mobility LLC v. Concepcion*, 593 U.S. 333, 339 (2011)).  Before the Court can compel

arbitration and stay such proceedings, however, it must determine: "(1) whether there is a valid

agreement to arbitrate; (2) whether a court or an arbitrator should decide if the dispute falls

within the scope of the agreement to arbitrate; and (3) whether the dispute does fall within the

scope—the question of arbitrability."  *PB Life & Annuity Co. v. Universal Life Ins. Co.*, 2020

WL 2476170, at *5 (S.D.N.Y. May 12, 2020) (citing *AT&T Techs., Inc. v. Commc'ns Workers of

Am.*, 475 U.S. 643, 648–50 (1986)); *see Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d

597, 605 (S.D.N.Y. 2020).

"[T]he Court applies a 'standard similar to that applicable to a motion for summary

judgment" in deciding a motion to compel arbitration under the FAA.  *Cornelius v. Wells Fargo

Bank, N.A.*, 2020 WL 1809324, at *4 (S.D.N.Y. Apr. 4, 2020) (quoting *Zhu v. Hakkasan NYC

LLC*, 291 F. Supp. 3d 378, 386 (S.D.N.Y. 2017)).  As on a motion for summary judgment, the

parties may submit documents in support or opposition of the motion, and the court "consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks and citation omitted).

"Arbitration is a matter of contract and consent, and . . . disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602 U.S. ----, ----, 144 S. Ct. 1186, 1191 (2024). Thus, "the FAA is not a substitute for contractual assent." *Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, 999 F.3d 828, 834 (2d Cir. 2021). Unlike the "enforceability or applicability" of an arbitration agreement, which may be delegated to an arbitrator, questions regarding the "formation of the parties' arbitration agreement" must be decided by a court. *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) (quoting *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010)); *id.* ("Arguments that an agreement to arbitrate was never formed . . . are to be heard by the court even where a delegation clause exists." (citation omitted)); *see also Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (moving party need not "show initially that the agreement would be enforceable, merely that one existed" (emphasis omitted)). That is because "[a]n agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all." *Doctor's Assocs.*, 934 F.3d at 251. "And if it is not a contract, it cannot serve as the basis for compelling arbitration." *Id.*; *see* 9 U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract.").  For these reasons, "[t]he threshold question facing any court considering a motion to compel arbitration is therefore whether the parties have indeed agreed to arbitrate."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).

## II.   Formation of Consumer Contracts Over the Internet

This motion involves whether an arbitration agreement, which is alleged to have been formed online, was actually entered into by the parties.  However, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004); *see Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231–32 (2d Cir. 2016); *Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1175–76 (2d Cir. 2014).  Principles of contract formation "apply with equal force to contracts formed online."  *Edmundson*, 85 F.4th at 703; *see also Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 547 (S.D.N.Y. 2018) ("Although the Internet age has certainly introduced new twists with regard to entering into contracts, the fundamental elements of contract law, including mutual assent of the parties, have not changed.").  "Whether the parties have agreed to arbitrate is generally a question of state contract law[;]" even so, "traditional contract formation law does not vary meaningfully from state to state."  *Edmundson*, 85 F.4th at 702–03.[3]

The foundational element of actions sounding in contract—and the element that distinguishes actions sounding in contract from those in tort—is that contractual duties generally

---

[3] Defendant asserts that New York law governs the question whether the parties entered into a binding agreement to arbitrate because the arbitration agreement contains a choice-of-law provision stating that New York law applies. Dkt. No. 17 at 8 n.3 (citing Dkt. No. 17-1). Plaintiff does not assert what law it thinks governs the question, but cites caselaw stating that "New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term." Dkt. No. 18 at 2 n.1 (quoting *Meyer*, 868 F.3d at 74 (internal quotations omitted)); *see also Pacific Indem. Co. v. Kiton Corp.*, 2022 WL 4237092, at *2 (S.D.N.Y. Sept. 14, 2022) ("A court may presume that the parties consent to the application of the forum state's choice of law when no party raises choice of law").

arise only where there is a mutual meeting of the minds, ordinarily measured by an offer, acceptance, and consideration.  *See, e.g.*, *Broder v. Cablevision Sys. Corp.*, 329 F. Supp. 2d 551, 556 (S.D.N.Y. (2004) ("For a contract to be valid under New York law, there must be an offer, acceptance, and consideration."); *Hecimovich v. Encinal Sch. Parent Teacher Org.*, 203 Cal. App. 4th 450, 475 (2012).  A person assumes contractual duties only when she voluntarily undertakes to discharge those duties.  "To form a contract, there must be '[m]utual manifestation of assent, whether by written or spoken word or by conduct.'"  *Meyer*, 868 F.3d at 74 (quoting *Specht v. Netscape Commnc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002)).

The principles are the same in the online world.  Although "an offeree's manifestation of assent to an offeror's terms looks different for consumer contracts formed online, in which terms are usually unnegotiated and consumers often proceed without reading the fine print," traditional principles of contract still apply and endure.  *Edmundson*, 85 F.4th at 703.  The Second Circuit has in the online context distinguished between "'clickwrap' (or 'click-through') agreements, which require users to click an 'I agree' box after being presented with a list of terms and conditions of use, [and] 'browsewrap' agreements, which generally post terms and conditions on a website via a hyperlink at the bottom on the screen."  *Meyer*, 868 F.3d at 75.  However, "classification of web-based contacts alone . . . does not resolve the notice inquiry."  *Id.* at 76.  "[R]egardless of the precise nature of a web-based contract, the ultimate question concerning inquiry notice on a motion to compel remains the same—namely, whether 'the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law.'"  *Soliman*, 999 F.3d at 835 (quoting *Meyer*, 868 F.3d at 76); *see also Plazza*, 289 F. Supp. 3d at 548 ("Although clickwraps present a far simpler determination for a court given the express and unambiguous manifestation of assent through the 'click' of an 'I accept' button,

courts have also found browsewrap agreements valid and enforceable so long as there is some form of reasonably conspicuous notice.").  Before an internet or app user can be bound by contractual terms, there must be evidence that " (1) a reasonably prudent person would be on *inquiry* notice of the terms, and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent."  *Edmundson*, 85 F.4th at 703 (internal citations and quotations omitted) (emphasis in original).

Courts have described the "reasonably prudent" internet user as one who is "not a complete stranger to computers . . ., having some familiarity with how to navigate a website." *Id.* at 704.  Such a user will be deemed to have had inquiry notice of the relevant terms only if the terms "are presented in a clear and conspicuous manner."  *Id.*; *see also Specht*, 306 F.3d at 30; *Soliman*, 999 F.3d at 834.  "In the context of web-based contracts, [courts] look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms."  *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019)  For example, a webpage gives inquiry notice where the webpage at issue is "uncluttered," the link to the relevant terms is "temporally" and "spatially coupled with the mechanism for manifesting assent," "[t]he entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the" terms, the link to the terms "are in blue and underlined," *Meyer*, 868 F.3d at 78, or where "the user could not avoid noticing the hyperlink [containing the terms of service] when she registered for an account," *Starke*, 913 F.3d at 294.  *See also Edmundson*, 85 F.4th at 706–07 ("[A]t this instance of purchase—when the user is about to receive a benefit from Klarna—a reasonably prudent user would understand that the terms presented on the interface govern the user's future relationship with Klarna.").  "The fact that the provision sought to be enforced was 'available

only by hyperlink' to another page, . . . 'does not preclude a determination of reasonable notice . . . [a]s long as the hyperlinked text was itself reasonably conspicuous.'" *Smith v. RPA Energy, Inc.*, 2024 WL 1869325, at *4 (S.D.N.Y. Apr. 30, 2024) (quoting *Meyer*, 868 F.3d at 78–79). But, "when terms are linked in obscure sections of a webpage that users are unlikely to see, courts will refuse to find constructive notice." *Nicosia*, 834 F.3d at 233; *see also Specht*, 306 F.3d at 23 (declining to enforce terms where the link to the terms "would have become visible to plaintiffs only if they had scrolled down to the next screen").

The second requirement—that the user unambiguously manifests assent to be bound by the terms through conduct that a reasonable person would understand to constitute assent—flows from the fact that the "[m]utual manifestation of assent, whether be written or spoken word or by conduct, is the touchstone of contract." *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 31–32 (2d Cir. 2002). "A party cannot manifest assent to the terms and conditions of a contract prior to having an opportunity to review them; a party must be given some opportunity to reject or assent to proposed terms and conditions prior to forming a contract." *Register.com*, 356 F.3d at 430. Resolution of the assent requirement thus is informed by the following factors: "(1) whether the interface clearly warned the user that taking a specific action would constitute assent to certain terms; (2) whether notice of the contractual terms was presented to the consumer in a location on the interface and at [a] time when the consumer would expect to receive such terms; and (3) the course of dealing between the parties, including whether the contract terms were conspicuously presented to the consumer at each use of the offeror's service and the consumer's conduct in response to the repeated presentation of conspicuous terms." *Edmundson*, 803 F.3d at 704–05 (internal citations and quotations omitted). If the user is not on notice of the existence of

terms and conditions prior to taking the specific action that would constitute assent, then there

can have been no meeting of the minds and no contract.  *See, e.g.*, *Starke*, 913 F.3d at 294.

## III.    Application of the Law to the Facts

Defendant asserts that Plaintiff is bound by the Terms of Service of the Website, and that

accordingly, Plaintiff must be compelled to arbitrate her claim.  *See* Dkt. Nos. 17, 19, 23.  There

is no dispute that Plaintiff did not have *actual* notice of the terms that contained the arbitration

provision; instead, Defendant asserts that a reasonably prudent user of the Website would be on

*inquiry* notice of the terms.  *See* Dkt. No. 17 at 2 ("NDR's Website plainly put any reasonably

prudent user, such as Plaintiff, on inquiry notice that Plaintiff's use of the NDR Website was

subject to NDR's Terms of Service, which specifically calls out the Arbitration Agreement on

the homepage and landing pages.").[4]  Thus, enforceability of the Terms of Service for the

Website, and the arbitration provision therein, turns on whether "notice of the arbitration

provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of

law."  *Meyer*, 868 F.3d at 76.

Defendant argues that Plaintiff was on inquiry notice of the Terms of Service because the

Website "provided reasonably prudent users, such as Plaintiff, with inquiry notice of the

Arbitration Agreement contained in its Terms of Service."  Dkt. No. 17 at 11.  Defendant avers

that the Website is "demonstrably uncluttered" and that "the Terms of Site hyperlink is

---

[4] Defendant asserts in its reply memorandum of law in support of the motion to compel that
"nowhere in her Opposition Brief . . . does Plaintiff deny personally being aware of having been
placed on notice of NDR's Terms of Site."  Dkt. No. 18 at 2.  But Defendant did not assert that
Plaintiff had actual notice in its initial memorandum of law in support of the motion to compel
and "the law in the Second Circuit is clear that arguments or requests for relief raised for the first
time in reply briefs need not be considered."  *In re Various Grand Jury Subpoenas*, 235 F. Supp.
3d 472, 485 (S.D.N.Y. 2017); *see also Haywin Textile Prod., Inc. v. Int'l Fin. Inv.*, 137 F. Supp.
2d 431, 434 (S.D.N.Y. 2001) ("It is well settled that courts should not consider arguments first
raised in a party's reply brief which afford no opportunity for response from the opposing
party.").

prominently featured in large, white font and stands out on a dark blue background, clearly visible to the Plaintiff (and others who visit the NDR Website) on the landing page and any page she would have accessed." *Id.* Thus, "regardless of whether or not Plaintiff chose to read" the Terms of Service, the Court should deem her to have been on inquiry notice of the terms. *Id.* at 12.

The threshold question presented by this motion, however, is whether Plaintiff knew or should have known—prior to Plaintiff having taken the action or inaction that Defendant argues constituted "assent"—that Plaintiff's action or inaction could be reasonably understood to constitute agreement to the terms of a contract. *See Schnabel*, 697 F.3d at 120 (a party can manifest assent to an agreement through "words or silence, action or inaction, but '[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents.'" (quoting Restatement (Second) of Contracts § 19(2)) (alteration in original)).

Defendant offers several theories to support that Plaintiff unambiguously manifested her assent to the Terms of Service. First, Defendant argues that by the very act of entering the Website, Plaintiff assented to the Terms of Service. *See* Dkt. No. 23 at 3 ("Plaintiff here manifested assent to the arbitration provision from her initial entry . . . [in]to the NDR Website."). Second, Defendant asserts that Plaintiff manifested assent to the Terms of Service by remaining on the Website after entering. *See id.* at 3 ("Plaintiff here manifested assent to the arbitration provision from her . . . continued use [of] the NDR Website."). Finally, Defendant asserts that Plaintiff manifested assent to the Terms of Service by returning to the Website on several occasions after her first visit. *See* Dkt. No. 17 at 13 ("Plaintiff cannot dispute she manifested assent to the Terms of Service by repeatedly visiting the Website."); Dkt. No. 19 at 1

("Plaintiff unambiguously and repeatedly manifested her assent to the Terms by continually visiting and using NDR's Website on multiple occasions over the course of fourteen months."). Finally, Defendant avers that Plaintiff assented to the Terms of Service by failing to exercise the opt-out provision contained within the terms.  *See* Dkt. No. 23 at 3 ("Plaintiff had an opportunity to reject and opt-out of the arbitration provision either by expressly opting out . . . .").  The Court considers each in turn.

### A.      Unambiguous Assent Upon Entering the Website

Defendant's first theory is that Plaintiff unambiguously assented to the Terms of Service by entering the Website.  On that theory, Defendant would have simultaneously intruded on Plaintiff's privacy by capturing her IP address and also curtailed her ability to use court processes to challenge that conduct by compelling her to arbitrate.

"An offer—and all of its terms—. . . ordinarily precedes acceptance."  *Schnabel*, 697 F.3d at 121.  There is general contract law that a person can be deemed to have assented to terms of an offer, even before seeing those terms, if she knew or should have known of the existence of terms, *i.e.*, that the good or service is being offered pursuant to terms and thereafter accepts the good or service.  *See* 2 Richard A. Lord, Williston on Contracts § 6:9 (4th ed. 1991) ("[T]he acceptance of the benefit of services may well be held to imply a promise to pay for them if at the time of acceptance the offeree has a reasonable opportunity to reject the service and knows or has reason to know that compensation is expected."); Arthur Linton Corbin, Corbin on Contracts § 71 (West 1 vol. ed. 1952) ("The acceptance of the benefit of the services is a promise to pay for them, if at the time of accepting the benefit the offeree has a reasonable opportunity to reject it and knows that compensation is expected.").  In those circumstances, if the offeree—with the opportunity to easily terminate the transaction—nonetheless continues with the transaction, the offeree is deemed to have assented to the offeror's terms.  In effect, a party who is offered a

benefit, and who knows or should know that such benefit is not offered gratuitously but pursuant to terms, is under an obligation to inquire into the terms of the offer *before* accepting the benefit. *See Schnabel*, 697 F.3d at 121–22 ("Whether or not there is notice to the consumer on the outside of the packaging that terms await him or her on the inside, courts have found such licenses to become enforceable contracts upon the customer's purchase and receipt of the package and the failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions of the contract included with the product.").

Additionally, a party can be deemed to have entered into a contract and agreed to all of the material terms tendered by the offeror even where the party does not expressly state that it accepts those terms. "[W]ords or silence, action or inaction" may constitute unambiguous evidence of assent, but ordinarily "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Schnabel*, 697 F.3d at 120 (quoting Restatement (Second) of Contracts § 19(2)); *see id.* at 128 ("[A]cceptance need not be express, but where it is not, there must be evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound."); *Register.com*, 356 F.3d at 403 ("[R]egardless whether [a user] did or did not say, 'I agree' . . . [the user's] choice was either to accept the offer of contract, taking the information subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits.").

Those principles apply in the virtual world much as they do in the physical world. *See Edmundson*, 85 F. 4th at 704 ("[W]here an internet or smartphone user does not explicitly say 'I agree' to the contractual terms, a court must determine whether a reasonably prudent user would

understand his or her conduct to constitute assent to those terms.").  Accordingly, the distinctive and unifying feature of all of the internet contract cases decided by the Second Circuit—and those cited by Defendant in support of its motion—is that the action or inaction that the courts have deemed to constitute unambiguous manifestation of assent follows, and does not precede, the time when the website visitor knew or should have known that a benefit was being offered pursuant to terms and that the visitor's conduct would be constitute assent to the terms.  *See Edmundson*, 85 F.4th at 704–08 (enforcing hybridwrap agreement after finding that plaintiff unambiguously assented to hyperlinked terms by clicking on a button that stated "Confirm and continue", because the button was "directly adjacent" to the statement "I agree to the <u>payment terms</u>", which linked to the terms); *Meyer*, 868 F.3d at 79–80 (enforcing hybridwrap agreement after concluding that plaintiff unambiguously assented to hyperlinked terms by clicking on a button that said "REGISTER" because just below the button was text advising users that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *Plazza*, 289 F. Supp. 3d at 549 (enforcing arbitration agreement where "users had to click on two buttons manifesting assent: a check box with the text 'I agree to the terms and conditions of the updated Terms of Service [and other terms],' and a red button right below it, with white text, reading 'I Agree' or 'Agree'"); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1107 (C.D. Cal. 2007) (granting preliminary injunction in case involving contract formed over the internet after concluding plaintiff was "highly likely to succeed in showing that Defendant received notice of the" relevant terms and "assented to them by actually using the website" where the relevant homepage itself contained the warning: "[u]se of this website is subject to express Terms of Use which prohibit commercial use of this site.  By continuing past this page, you agree to abide by these terms"); *Sw. Airlines Co. v. BoardFirst, L.L.C.*, 2007 WL 4823761,

at *4 (N.D. Tex. Sept. 12, 2007) (enforcing contract formed on the internet because there was

"no dispute that" defendant had *actual* knowledge of the relevant terms, and because "[d]espite

having actual knowledge of the Terms, [defendant] . . . continued to use the [] site in connection

with its business"); *Cairo, Inc. v. Crossmedia Servs., Inc.,* 2005 WL 756610, at *5 (N.D. Cal.

Apr. 1, 2005) (enforcing agreement formed over the internet because plaintiff "admit[ted] to

actual knowledge of [the] Terms" before repeatedly using the website at issue); *Ticketmaster

Corp. v. Tickets.com, Inc.*, 2003 WL 21406289, at *2 (C.D. Cal. Mar. 7, 2003) (enforcing

agreement formed over the internet because there was "developed evidence that [defendant] was

fully familiar with the conditions [plaintiff] claimed to impose on users" and defendant

nevertheless continued to access interior pages of the website after being informed that "anyone

going . . . into the interior web pages of the web site accepts certain conditions"); *Cf. Soliman*,

999 F.3d at 836–37 (declining to enforce arbitration agreement and stating "our concern about

the lack of inquiry notice is further heightened in this case by the fact that neither the

advertisement's larger-font text (promoting Subway's offer) nor the fine-print disclaimer *state

that a consumer who opts to participate in the promotion by texting the short code is also

agreeing to be bound by Subway's terms and conditions*" (emphasis added)); *Schnabel*, 697 F.3d

at 123 ("We do not think that an unsolicited email from an online consumer business puts

recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a

service in which the recipients had already enrolled, *and* that a failure to act affirmatively to

cancel the membership will, alone, constitute assent." (emphasis in original)).

  For example, in *Meyer*, the Second Circuit held that the plaintiff (an Uber driver) had

unambiguously assented to arbitration where, after being informed that by creating an Uber

account, he was agreeing to the company's terms of service and privacy policy, the plaintiff

clicked a button marked "Register."  *Meyer*, 868 F.3d at 76.  In that case, the language informing the plaintiff of the consequences of registering was immediately below the "Register" button, and the plaintiff would not have seen the "Register" button without also seeing the language putting him on inquiry notice that the act of registering would reflect assent to the relevant terms. The court held, "[a] reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not.  The fact that clicking the register button had two functions—creation of a user account and assent to the Terms of Service—does not render Meyer's assent ambiguous." *Meyer*, 868 F.3d at 79–80.

The mere act of entering the Website here cannot constitute unambiguous assent to a contract comprised of the Terms of Service because there is no evidence that *prior to entering into the Website*, Plaintiff was put on inquiry notice of the existence of terms or knew or should have known that Defendant would infer from her decision to enter the Website that she assents to the Terms of Service.  "Submission of a single query [to enter the Website] does not manifest assent to be bound by the terms of use even though the terms themselves say otherwise [because] [a] party cannot manifest assent to the terms and conditions of a contract prior to having an opportunity to review them[.]"  *Register.com*, 356 F.3d at 430.  An internet user that inputs the Website address into her browser and presses enter is immediately shown the Website's content. She is not made aware beforehand that there may be terms of use.  The visitor also is not presented with any intervening screen or pop-up notifying her that by entering the Website she will be agreeing to the Terms of Service.  Defendant identifies nothing in the nature of the service it offers, or in the Website address that a visitor would enter in her browser that would inform the user that the mere entry into the Website would itself bind the entrant to terms and

conditions governing the visitor's use of the Website.  Defendant's first theory thus reverses the

typical order of offer and acceptance, and would deem the Plaintiff to have accept an offer even

before knowing that there would be an offer on the table it would have to accept.

  **B.**  **Unambiguous Assent by Remaining on the Website**

  Defendant's second theory is that Plaintiff manifested assent to the Terms of Service by

remaining on the Website.

  In the "browsewrap" category of contracts formed on the internet, a user takes no

affirmative action to manifest assent to the agreement, and instead, signals agreement to be

bound "simply by continuing to use the website."  *Berman v. Freedom Fin. Network, LLC*, 30

F.4th 849, 856 (9th Cir. 2022).  The website in a browsewrap case does not, as "clickwrap"

arrangements do, "require users to click an 'I agree' box after being presented with a list of terms

and conditions of use."  *Meyer*, 868 F.3d at 75; *see also Nguyen*, 763 F.3d at 1176–77 (noting

that courts are generally "more willing to find the requisite notice for constructive assent where

the browsewrap agreement resembles a clickwrap agreement—that is, where the user is required

to affirmatively acknowledge the agreement before proceeding with use of the website").  In the

paradigmatic example of a contract formed as a browsewrap agreement, the visitor continues to

use a website or access information contained on it after being informed that such usage will be

deemed to create a contractual relationship.  *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 837

(S.D.N.Y.2012) ("[I]n a pure-form browsewrap agreement, 'the website will contain a notice

that—by merely using the services of, obtaining information from, or initiating applications

within the website—the user is agreeing to and is bound by the site's terms of service.'" (quoting

*United States v. Drew*, 259 F.R.D. 449, 462 n. 22 (C.D.Cal.2009))).

  Although "browsewrap agreements are not presumptively unenforceable," *Plazza*, 289 F.

Supp. 3d at 548, they too must comport with traditional tenets of contract law, under which a

party must be on notice *prior to* the conduct asserted to be the unambiguous manifestation of
assent that such conduct would be deemed acceptance of the terms of an offer, *see, e.g.*, *Berman*,
30 F.4th at 865 (Barker, J., concurring) ("[I]f browsewrap is to be enforceable, 'a textual notice
should be required to advise consumers that continued use of a Web site will constitute the
consumer's agreement to be bound by the Web site's terms of use,'" (quoting *Long v. Provide
Commerce, Inc.*, 245 Cal.App.4th 855, 200 Cal. Rptr. 3d 117 (2016))); *see also Soliman*, 999
F.3d at 837 ("[W]e have emphasized the importance of clearly signaling to the consumer in some
fashion that, by continuing with the transaction or by using a website, she will be agreeing to the
terms contained in an accompanying hyperlink.").

The relevant principles are captured by the draft Restatement of Consumer Contracts:
"Standard contract terms governing the proprietary environment of the business—whether
physical or digital—may be adopted as part of a consumer contract upon entry to, or continued
use of, that environment, even if no purchase is concluded while in the environment."
Restatement of Consumer Contracts § 2 cmt. 7.  But, "[t]he deliberate act of entering the
business's proprietary environment and remaining in it long enough to gain access to the content
and benefits it confers could constitute a manifestation of assent by the consumer to a transaction
*if the consumer is reasonably so informed*."  *Id.* (emphasis added).  A consumer is "reasonably
so informed" if she receives notice of the legal effect and opportunity to review "prior to entry."
*Id.*  The Restatement authors go on to state:

> If, instead, the notice and opportunity to review, along with notice of the contractual
> effect of continued use, are provided only after entry . . ., the manifestation of assent
> to the transaction and the adoption of the terms occur upon the continued use of the
> proprietary environment and receipt of its benefits.  In such a case, *the consumer
> must receive reasonable notice that continued use will constitute adoption of the
> terms as a binding contract*, a reasonable opportunity to review the terms, and a
> reasonable opportunity to exit without being bound to the terms.

*Id.* Applying these principles to the internet context, a contract can be formed if there is "evidence that the offeree knew or should have known of the terms and understood that acceptance of the benefit would be construed by the offeror as an agreement to be bound," and, after having been put on such notice, continued to accept the benefit. *Edmundson*, 803 F.3d at 703 (quoting *Schnabel*, 697 F.3d at 128)).

The evidence before the Court does not establish either Plaintiff continued to use the Website after being put on inquiry notice that by using the Website or obtaining information from it she would be deemed to have manifested assent to the terms of the Website or that, if she did not have prior notice of being bound, she was given a reasonable opportunity to exit after receiving a reasonable opportunity to review the terms. The notice is at the very end of the homepage of the Website, not "temporally" or "spatially" linked to the action or inaction that would be deemed to manifest assent. There is nothing on the face of the Website or in the content that it offers that would suggest to the visitor that the content is being offered for consideration and not for free or that a visitor should hunt for or expect to find terms of use for the Website itself. The content of the Website is in the nature of an advertisement; it promotes Defendant's services, contains customer testimonials and offers a "free, no-obligation debt relief consultation." Dkt. No. 18-1. The homepage does not contain any information that would itself be useful to a consumer in reducing her debt load. There is nothing in it that would signal that simply by reading the quotes from satisfied customers or being given the links to "Essential Reading," that the visitor is somehow taking a benefit for which he should be expected to pay consideration or that there would be terms and conditions attached to the mere review of the homepage.

Plaintiff also is not given any other reasonable notice prior to usage of the Website that continued use of the Website will constitute adoption of Defendant's terms as a binding contract. The Terms of Service, which are available through a hyperlink at the bottom of the homepage, state that a visitor's use of the Website will be deemed to be an agreement to abide by Defendant's terms and that the visitor should not access or use the Website if she does not agree to the terms.  Dkt. No. 17-1 at ECF P. 8.  But that hyperlink itself is not immediately visible to a visitor to the Website, and is visible only after the user has to scroll through several sections of content containing promotions for Defendant's product.  *See Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 367 (E.D.N.Y. 2009) (declining to enforce arbitration provision after finding defendant had "failed to show that Plaintiff had constructive notice," in part because the plaintiff "could not even see the link to [the terms and conditions] without scrolling down to the bottom of the screen"), *aff'd*, 380 F. App'x 22 (2d Cir. 2010); *cf. Meyer*, 868 F.3d at 78 (enforcing arbitration agreement where the "entire screen [was] visible at once, and the user [did] not need to scroll beyond what [was] immediately visible to find notice of the" terms at issue).  Defendant has not offered any reason to believe that a user would scroll through each of the interim sections to see the hyperlink to the Terms of Service; each of the sections of content that precede the section containing the hyperlink is freestanding, and does not encourage the visitor to continue down the page.  *See Specht*, 306 F.3d at 32 ("Internet users may have, as defendants put it, as much time as they need to scroll through multiple screens on a webpage, but there is no reason to assume that viewers will scroll down to subsequent screens simply because screens are there.").  Nor does the material that the Website offers naturally draw the viewer to any information below.  Indeed, a visitor who wanted to apply for Defendant's services would need go no further than what is immediately visible when entering the Website before pushing the button to "Apply

Now," and the visitor who wanted to obtain a free consultation would need go no further than the second section, still well above where the hyperlink to the Terms of Service is visible.  There would be no reason for such a visitor ever to scroll down to the hyperlink to the Terms of Service, and no reason for such a visitor upon seeing the language stating "Apply Now," or "Submit" for a free consultation to know that merely by staying on the Website they had already agreed to Defendant's contractual terms.  *See Berman v. Freedom Fin. Network. LLC*, 30 F.4th 849, 857 (9th Cir. 2022) ("[W]hile it is permissible to disclose terms and conditions through a hyperlink, the fact that a hyperlink is present must be readily apparent.").

Additionally, even if the visitor were to scroll past a plethora of text in several colors, a multitude of buttons, and several promotional advertisements, the hyperlink to the Terms of Service is surrounded by several links to other pages, appearing in the middle of the center column of an area of the Website that contained eighteen links to other pages.  *See Nguyen*, 763 F.3d at 1174 (declining to enforce arbitration agreement in a website's terms of use because the hyperlink to the terms was "located in the bottom left-hand corner of every page" and appeared "alongside other hyperlinks"); *Nicosia*, 834 F.3d at 237–38, 241 (Addendum B) (declining to enforce hyperlinked terms because the interface in question contained "between fifteen and twenty-five links" that were displayed "in at least four font sizes and six colors (blue, yellow, green, red, orange, and black), alongside multiple buttons and promotional advertisements"); *Starke*, 913 F.3d at 293 (declining to enforce arbitration provision where the link to the terms and conditions was surrounded by "diverse text, displayed in multiple colors, sizes and fonts" on an interface that featured "various buttons and promotional advertisements that distract the reader from the relevant hyperlink"); *cf. Edmundson*, 85 F.4th at 705 (enforcing arbitration provision where "the only link provided is to [the] terms").  And even then, if the visitor were to manage to

27

see the hyperlink, there is nothing in the hyperlink's display that would alert the visitor that merely staying on the Website would be deemed to constitute assent to the Terms of Service. Dkt. No. 18-1 ¶ 3.  And even if the visitor for some reason did scroll down to the bottom of the homepage and was put on notice that the Terms of Service would apply to the mere review of the homepage, by that time, on Defendant's theory, the contract would already have been formed. The visitor would already have "used" the Website and obtained information from it.  There is no notice that "continued use will constitute adoption of the terms as a binding contract." Restatement of Consumer Contracts § 2 cmt. 7.

Finally, Defendant's second theory does not admit of a reasonable opportunity to exit even assuming the visitor knew of Defendant's terms.  The Terms of Service state that Defendant's use of the Website itself is deemed agreement to abide by each of the terms and that if the visitor does not agree to the terms she should not access or otherwise use the Website.  But by the time the visitor would have had opportunity to see the Terms of Service she already would have accessed the Website and, if use means viewing the homepage, already used the Website. The Website does not offer the visitor the opportunity to avoid contractual obligations by the simple expedient of no longer continuing to use the Website.  For example, the Website does not offer a pop-up page or any other technology informing the visitor upon entering the Website that there will be terms and conditions and that by staying on the Website for a specified period of time the visitor will be deemed to have consented to the terms and conditions.  It simply informs the visitor after the fact that by having accessed the Website and viewed its consents she has already assented to the terms without giving the visitor any opportunity to exit and to avoid those terms.

28

Defendant's second theory thus also fails because it does not demonstrate an unambiguous manifestation of assent to contractual terms.

### C.      Unambiguous Assent by Returning to the Website

Defendant's third theory of assent is that Plaintiff unambiguously manifested assent to be bound to the Terms of Service by returning to the Website on several occasions.  To be sure, a user could be deemed to have consented to the terms of a website if, before entering the website, she knew or should have known that there would be terms of service.  *See Schnabel*, 97 F.3d at 120; *Register.com*, 356 F.3d at 402 (holding party manifested assent to terms by entering a website because the defendant "admitted that, in entering [plaintiff's] computers to get the data, it was fully aware of the terms on which [plaintiff] offered the access").  Such notice could come from a pop-up screen that is displayed before the visitor is admitted to the website or from information that puts the visitor on inquiry notice from a prior visit.  In theory, information about the Terms of Service that are reasonably conspicuous upon a visit to a website could put the viewer on inquiry notice with respect to future visits to that Website.

But the force of that argument is only as strong as the argument that the information about the Terms of Service puts the visitor on inquiry notice.  If a visitor to a website would not be on inquiry notice from visiting the website the first time that by viewing the contents of the homepage, she has assented to the website's Terms of Service, it does not matter that she has entered the website (or stayed on it) a second time.  The website still would not have given inquiry notice.  *See Starke*, 913 F.3d at 296 (holding that plaintiff did not give effective consent to terms by returning to website because "[a]lthough Starke had transacted with SquareTrade on six prior occasions, SquareTrade never gave Starke clear and conspicuous notice that the transaction would subject him to binding arbitration"); *Register.com*, 356 F.3d at 431 (holding that submission of multiple queries does not constitute unambiguous manifestation of assent

where visitor would believe that the information is being "made freely and publicly available");
*Benson v. Double Down Interactive, LLC*, 798 F. App'x 117, 119–20 (9th Cir. 2020) ("Repeated
use of a website or mobile application does not contribute to constructive notice because users
are no more likely to stumble upon inconspicuous hyperlinks on their hundredth or thousandth
visit than they are on their first.").

Here, the Court has already determined that a reasonably prudent user of the Website
would not be on inquiry notice of the Terms of Service upon using the Website.  There is no
reason to think that a reasonably prudent user of the internet who returns to the Website on
several occasions would have been more likely to have on an earlier occasion scrolled all the
way to the bottom of the Website, and to have encountered the hyperlink to the Terms of Service
or appreciated its significance.  *See Specht*, 306 F.3d at 32.  Thus, the act of returning to the
Website cannot constitute the unambiguous manifestation of assent to the Terms of Service in
the absence of any evidence or reason to believe that the person who visits the Website for the
second time would have been put on notice from her visit to the Website for the first time that
there would be Terms of Service applicable to the viewing of the Website.

### D.    Unambiguous Assent by Failing to Exercise the Opt-Out Provision

Finally, Defendant suggests that because, under the Terms of Service, Plaintiff had a right
to opt-out of mandatory arbitration and she did not exercise that right, she should be deemed to
have assented to it.  *See* Dkt. No. 17 at 6; Dkt. No. 23 at 2.  As noted *supra*, the Terms of Service
give a visitor to opt out of mandatory arbitration within thirty days of the date on which the
visitor first began using the Website, by sending a letter by United States mail to Defendant or by
emailing Defendant.  Dkt. No. 17-1 at ECF P. 8.

Here, the analogy to terms provided within the packaging of consumer goods, which an
offeree can reject by returning the contents of the package, is apt.  Under this theory, Plaintiff

would have assented to the Terms of Service not upon entry into the Website, use of the Website, or return to the Website alone; rather, Plaintiff would have later assented by having failed to exercise the opt-out provision. *See Schnabel*, 697 F.3d at 110 (noting shrinkwrap agreements "become enforceable contracts upon the customer's . . . failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions of the contract included with the product"). Plaintiff—having availed itself of the benefit of visiting, using, or returning to the Website and having received an opportunity to review the Terms of Service contained therein—would be deemed to have assented to the arbitration provision by neglecting to inform Defendant that she was opting out. Such an arrangement bears similarity to often-enforced shrinkwrap agreements, in which a consumer purchases packaged goods—with or sometimes even without notice that terms will be contained within the packaging—and can be bound to terms contained in the packaging if the consumer does not thereafter return the product. *See, e.g.*, *Schnabel*, 697 F.3d at 121–22 ("In shrinkwrap-license cases, the terms at issue are typically provided inside the packaging of consumer goods. Whether or not there is notice to the consumer on the outside of the packaging that terms await him or her on the inside, courts have found such licenses to become enforceable contracts upon the customer's purchase and receipt of the package and the failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions of the contract included with the product."); *Register.com*, 356 F.3d at 428 ("[I]n the shrinkwrap context, the consumer does not manifest assent to the shrinkwrap terms at the time of purchase; instead, the consumer manifests assent to the terms by later actions.").

But that theory presupposes the answer to the very question that is presented by this motion—whether Plaintiff is bound by the Terms of Service because she was on inquiry notice

that there would be terms governing her use of the Website before she took action (or engaged in inaction) to unambiguously assent to the terms of service.  Plaintiff was not on inquiry notice. This is not a case in which the defendant withholds a good or service or a benefit until *after* the visitor has an opportunity to be aware of Defendant's terms and to review them and the visitor (already on notice of the existence of terms) can be deemed to have accepted them by accepting the good or service or benefit.  "By the time [defendant] presents its proposed terms, it has already given away that which it 'owns'—access to the content on the home page of the Website." *Register.com*, 356 F.3d at 431.  As in *Register.com*, the visitor to the website "would have had no opportunity to reject [Defendant's] terms and would be bound to comply with them irrespective of actual assent."  *Id.*

If, as the Court has concluded, the Website is not of the sort that would suggest to the user that the content is being offered pursuant to terms (and there is no reason to believe that a repeat visitor would have scrolled down to the hyperlink for the Terms of Service in a first visit) then there would have been no way for Plaintiff to know that there was an arbitration agreement to opt out of in the first place.  *See, e.g.*, *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444, 471 (2021) ("[T]he full context of the transaction is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms."); *id.* at 460 (noting it is "questionable whether a consumer buying a single pair of socks, or signing up for a free trial, would expect to be bound by contractual terms, and a consumer that does not expect to be bound by contractual terms is less likely to be looking for them"); *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 517 (9th Cir. 2023) ("[I]n contrast with the noncommittal free trial offered in Sellers, the context of this transaction, requiring a full registration process, reflected the contemplation of 'some sort of continuing relationship' that would have put users

32

on notice for a link to the terms of that continuing relationship."). Thus, Plaintiff cannot be deemed to have assented by failure to opt-out of terms she was not on inquiry notice of and therefore was not bound by in the first place.

## CONCLUSION

The motion to compel arbitration and stay the case is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 16 and 23.

SO ORDERED.

Dated: July 8, 2024
        New York, New York

_____
                LEWIS J. LIMAN
        United States District Judge